In re BEEF INDUSTRY
ANTITRUST LITIGATION.

This document relates to the
Packer cases:

CA 3–77–1080–G (Ludvigson),

CA 3–77–0990–G (Cameron),

CA 3–77–0780–G (MPIA),

CA 3–78–0124–G (Trigg) and

CA 3–78–0123–G (Lee).

Civ. A. Nos. 3–77–1080–G, 3–77–0990–G,
3–77–0780–G, 3–78–0124–G and
3–78–0123–G.
M.D.L. No. 248.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 28, 1988.

As Corrected Jan. 4, 1989.

Motion for Reconsideration
April 25, 1989.

Scott A. Hawkins, Hawkins & Hawkins, Dallas, Tex., Lex Hawkins, Glenn L. Norris, George F. Davison, Jr. and Carla T. Cook, Hawkins & Norris, Des Moines, Iowa, John A. Cochrane and Stewart C. Loper, Cochrane & Bresnahan, P.A., St. Paul, Minn., Donald J. Polden, Des Moines, Iowa, James W. Witherspoon and James E. Elliott, Witherspoon, Aikin & Langley, Hereford, Tex., and Lowell V. Summerhays, Sandy, Utah, for plaintiffs.

William G. Schopf, Jr. and Patrick J. Heneghan, Schopf & Weiss, Chicago, Ill., for defendant, IBP, Inc.

John C. Dods and James T. Newsom, Shook, Hardy & Bacon, Kansas City, Mo., for defendant, Excel.

Morris Harrell and Marshall M. Searcy, Jr., Rain, Harrell, Emery, Young & Duke, Dallas, Tex., for the Packer defendants.

Timothy M. Gallagher and George T. Frampton, Chicago, Ill., for defendant, Nat. Provisioner.

## MEMORANDUM OPINION

KAZEN, District Judge.

Plaintiff cattle feeders bring suit under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, alleging that the Defendant beef packers combined and conspired to artificially depress the price of live cattle, and attempted to and conspired to monopolize the cattle slaughter and beef fabrication industry. Defendant packers are IBP, Inc. (formerly Iowa Beef Processors, Inc.) and Excel Corporation. National Provisioner, Inc., publisher of The Daily Market and News Service ("The Yellow Sheet"), is also named as a conspirator in the § 1 claim. Pending are motions for summary judgment by the Defendants.

### Prologue

This multidistrict litigation has been ongoing for more than 12 years. The instant motions represent the "packer" prong of the litigation. The cattle feeders had earlier attempted to establish liability against various retail grocery chains. The feeders had alleged that the retailers conspired to purchase beef from packers at artificially depressed prices. These depressed prices were allegedly reflected in the Yellow Sheet and were "passed on" to the feeders by the packers, who allegedly bought cattle from the feeders using a fixed price formula based on the Yellow Sheet. Judge Patrick E. Higginbotham, then of the United States District Court for the Northern District of Texas, granted the retailers' motions for summary judgment. *In re Beef Industry Antitrust Litigation*, 542 F.Supp. 1122 (N.D.Tex.1982). His decision was affirmed by the Fifth Circuit. 710 F.2d 216 (5th Cir.1983).

In his lengthy opinion, Judge Higginbotham concluded that "a variety of factors influenced the pricing decisions made by packers: individual needs, competition and negotiation for cattle, estimation of yield and grade of cattle, conditions in the cattle markets, and the fluctuation of the by-product market." 542 F.Supp. at 1131. He also found that "empirical studies presented by retailers demonstrate that the Yellow Sheet is not the index of a reasonably precise pricing formula." *Id.* at 1135.

### Summary Judgment Standard

The pending motions must be evaluated in the light of *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Similar to this case, plaintiffs in *Matsushita* invoked §§ 1 and 2 of the Sherman Act, claiming that the defendants had conspired to monopolize the American market in television sets by predatory pricing designed to drive American manufacturers out of business. The Supreme Court held that once defendants have carried their initial burden of demonstrating the absence of a genuine issue of material fact, the plaintiffs, to survive summary judgment, must establish the existence of a genuine issue of material fact as to whether defendants entered into an illegal conspiracy that caused plaintiffs

to suffer a cognizable injury. *Id.,* 106 S.Ct. at 1355–56. If Plaintiffs' claim in its factual context "is one that simply makes no economic sense," they must come forward with "more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 1356. Conduct as consistent with permissible competition as with illegal conspiracy will not support an inference of antitrust conspiracy. Plaintiffs' evidence must tend to exclude the possibility that the alleged conspirators acted independently. *Id.* at 1357. "Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence." *Id.* at 1361.

### Section 1 Claim

The feeders' § 1 claim alleges that the Defendant packers, aided by the National Provisioner, conspired to fix the price of live cattle by the following conduct:

1. Agreeing to quote substantially identical bids for live cattle;

2. Agreeing to tie bidding on live cattle to the Yellow Sheet;

3. Exchanging market information through oral and written communication and by interchanging key employees;

4. Purchasing carcass, primal and subprimal beef from each other for the purpose of fixing the reported price;

5. Manipulating the carcass, primal and subprimal prices of beef reported in the Yellow Sheet; and

6. Boycotting and agreeing to boycott cattlemen in given areas to artificially lower the price of live cattle.

The sixth allegation can be rejected outright. There is no proof, direct or circumstantial, of any such boycott, and the feeders appear to have abandoned this contention. Similarly there is no credible evidence of Defendants' interchanging key employees as part of any scheme to fix prices. The remaining allegations can be distilled into an argument that the Defendant packers, in collusion with the National Provisioner, used the Yellow Sheet to artificially depress the price of live cattle, and that through transactions between themselves, the packers rigged the prices reflected in the Yellow Sheet.

A party suing under section 1 of the Sherman Act must show the existence of a contract, combination or conspiracy. Independent action is not proscribed. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The evidence must reasonably tend to prove that the Defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Id.,* 104 S.Ct. at 1473. The feeders essentially concede that they have no direct evidence of any agreement to fix prices. They rely upon two theories to show an unlawful agreement. The first is that an information exchange which stabilizes price is evidence of an illegal conspiracy, citing *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). However, the instant case is distinguishable. Unlike *Container Corp.,* the Yellow Sheet does not involve the direct exchange of information between competitors. Also, the information published in the Yellow Sheet is a statistical report on past average price to all customers, and the information is public. *See, Wilcox v. First Interstate Bank of Oregon,* 815 F.2d 522, 526 (9th Cir.1987). An exchange of price information which constitutes reasonable business behavior is not an illegal agreement. *Id.* at 527.

The second theory is that an agreement is shown by parallel business behavior or "conscious parallelism." A plaintiff relying on a theory of conscious parallelism must show two things: (1) that the defendants engaged in consciously parallel action, and (2) that this parallel action was contrary to their economic self-interest so as not to amount to a good-faith business judgment. *Pan–Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 559 (5th Cir. 1980). To avoid summary judgment under this theory, Plaintiffs cannot rely on proof of parallel behavior alone. Significant probative evidence of conscious parallelism is required, with some "plus factor" tending to exclude the possibility that the packers' behavior was unilateral. *Royal Drug Co.*

*v. Group Life and Health Ins. Co.,* 737 F.2d 1433, 1437 (5th Cir.1984); *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253–54 (2d Cir.1987).

■ The packers present plausible evidence that their pricing behavior was unilateral. They readily admit that the price of beef reported in the Yellow Sheet was always a key factor in their pricing decisions for live cattle. Russell A. Walker, Vice President–Cattle Procurement for IBP, stated in an affidavit of September 12, 1977, that the Yellow Sheet price was "an important factor … because it tells me what IBP can get, currently for the carcass of the cattle I buy." Walker Affidavit, para. 5. The affidavits of Walker and Lanny L. Binger, his former counterpart at EXCEL, establish that packers considered many factors when offering a price for live cattle. These factors include those noted by Judge Higginbotham in his decision granting the retailers' motions for summary judgment. 542 F.Supp. at 1131–34. As Judge Higginbotham put it: "Characterizing the use of the Yellow Sheet as a mechanical formula proves nothing. An habitual use of a 'rule of thumb' by packers is nonetheless a rule of thumb." *Id.* at 1139. This conclusion is buttressed by the feeders' inability to establish, after a decade of litigation and extensive discovery, that over any certain period of time, the packers offered the same price for live cattle. At best, the evidence shows that the packers in their independent efforts to purchase beef in the same markets, made similar use of a national publication recognized as a reliable source of market information. Use of this information was not contrary to each packer's economic self-interest. Russell Walker's affidavit indicated that the Yellow Sheet price is important because it tells the packer the price at which it can sell the carcass. Obviously this is an entirely reasonable business objective. Donald L. Paulsen stated in his original affidavit that the packer's goal is to not lose money on the purchase of live cattle. "Any continuing loss from purchase of live cattle would quickly put the packer out of business because of the magnitude of the dollars involved in cattle purchases." D. Paulsen Affidavit, para. 12.

Under *Matsushita,* feeders must produce evidence tending to exclude the possibility that the packers acted independently. The feeders' key evidence of a conspiracy to fix live cattle prices consists of affidavits by Donald L. Paulsen and Eileen D. Paulsen. Donald Paulsen was Assistant Head Cattle Buyer for IBP from December 1971 until March 1979. He avers that during this time, and even back to 1959 while he was working for other packing companies, "it was common knowledge within the packing industry that the fed cattle price was determined by the dressed beef price stated in the National Provisioner Yellow Sheet." D. Paulsen Affidavit, para. 9. He further states that after the 1973 price freeze, the dressed beef price fell for extended periods of time on several occasions. During these times, the practice of IBP and other packers was to purchase cattle on the basis of "Yellow Sheet day of kill,"[1] although there were exceptions to this practice "if we did not have enough cattle purchased to meet our kill needs." *Id.,* para. 13. While the dressed weight price for live cattle was normally determined by the Yellow Sheet, there would be "slight adjustments" for slaughter profitability and current inventory position. *Id.,* para. 15. He expressly recognized other factors "which sometimes influenced the cattle prices," but claimed that these factors were not significant. *Id.,* para. 20.

Eileen D. Paulsen was formerly employed by IBP as a clerk, compiling buyer information and paying for live cattle. She also avers that it was "common knowledge among all office employees of IBP" that the Yellow Sheet was "the basis for cattle purchases." E. Paulsen Affidavit, para. 5. She claims to have overheard telephone conversations between unidentified "outside beef salesmen" and unidentified "customers and brokers" and also with the National Provisioner. *Id.,* para. 7. Presum-

---

1. "Yellow Sheet day of kill" refers to the practice of paying a price for live cattle based on the dressed beef price on the day the cattle are slaughtered.

ably based on these conversations, she concludes that if the Yellow Sheet "was not going the way IBP's beef salesmen want it to go," the salesmen would arrange to report prices in accordance with "the way IBP wanted the market to go." *Id.* She further avers that it was "the beef salesmen's intent" to report to National Provisioner a price which would be the last trade of the day and therefore establish the Yellow Sheet closing price. *Id.*, para. 8.

Stripped of the hearsay, especially in Eileen Paulsen's affidavit, the two Paulsen affidavits cannot establish the necessary evidence of an unlawful conspiracy or agreement. When Plaintiffs rely exclusively on circumstantial evidence, as here, inference of an unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference. *Weit v. Continental Ill. Nat. Bank & Trust Co.*, 641 F.2d 457, 463 (7th Cir.1981). Where the product in question is fungible, parallel conduct itself tends to lack probative significance. *Id.* The mere opportunity to conspire is also not necessarily probative evidence. *Id.* at 462.

In addition to the Paulsens' conclusory allegations, Plaintiffs point to other evidence that they argue are "plus factors" which, along with parallel conduct, raise a permissible inference of conspiracy. First, they argue that packer-to-packer trades of beef carcasses are evidence of packer manipulation of Yellow Sheet prices. Second, they argue that the existence of a conspiracy to depress prices can be inferred from the fact that on two historical occasions where the Yellow Sheet was not used, higher prices were paid for live beef.

Plaintiffs identify several discrete occasions over a period of years where one Defendant packer sold carcasses to another. In a supplemental affidavit, Donald L. Paulsen concluded that this was "unusual activity" which appeared "to influence the final price that is printed" in the Yellow Sheet. D. Paulsen Supp. Affidavit, paras. 6, 8. As noted earlier, Eileen D. Paulsen expressed a similar opinion, although she furnished no specifics to support that opinion. Responding to this ambiguous circumstantial evidence of an unlawful conspiracy, packers offer reasonable and justifiable explanations for these transactions. For example, on occasion a packer sells carcasses that do not fit its processing specifications. Sometimes the cost of transportation makes it more economical for one packer to purchase carcasses from a competitor's geographically closer facility than from one of its own, more remote facilities. Maintaining an adequate supply of carcasses to customers and keeping certain facilities operating at profitable levels are also reasons for packer-to-packer transactions.

Work sheets prepared by National Provisioner reporters and submitted by Plaintiffs as evidence fail to support the claim of a conspiracy to artificially depress prices. More often than not, carcass sales by a Defendant packer were actually above the Yellow Sheet price. Donald Paulsen's supplemental affidavit contains an analysis of selected transactions in the Fall of 1974. He concludes that a transaction on September 5, 1974 by IBP "appears to be a way to raise the Yellow Sheet quote for the day." Supp. Affidavit, Para. 8(b). He further concludes that a transaction of October 2, 1974 by IBP did "appear to influence the yellow sheet with the result being a higher closing market for the day." *Id.*, para. 8(i). What little tangible evidence of manipulation exists, therefore, actually tends to contradict Plaintiffs' theory of the case.

Primarily through the affidavit of James H. Cothern, Plaintiffs claim that the absence of the Yellow Sheet historically led to higher cattle prices, thus proving circumstantially that use of the Yellow Sheet is the result of an unlawful conspiracy. In the 1970's, the Yellow Sheet was allegedly not used as the basis for live cattle prices on the west coast. Dr. Cothern states that his "studies indicate" that for most of this period, the California prices averaged 2-cents-per-pound higher than the price received for fed cattle east of the Rockies. Cothern Affidavit, para. 9. Also in 1973, a wage-price freeze was imposed, freezing the price for wholesale beef. During that time, the live cattle price rose from approximately 43 cents to 58 cents. When the

price freeze was lifted, the price dropped. *Id.*, para. 10.

The Court agrees with the packers that the evidence supporting these propositions is too speculative and conclusory to defeat a summary judgment motion. With respect to the price freeze, such factors as the substantial decrease in the number of cattle brought to market and a corresponding increase in demand for the product by retail consumers were not properly considered. Further, packers at that time were acting as direct buyers for retailers. Higher cattle prices may be explained by the ability of retailers to offset losses on the retail sale of beef with profits from sales of other groceries. With respect to the alleged west coast market of the 1970's, Dr. Cothern's conclusions are so vague as to be inadmissible as probative evidence. Moreover his analysis does not consider transportation differentials and the inherent differences in market dynamics. He describes the west coast market as "characterized by smaller packing companies located in relatively close proximity to one another competing for the available cattle from larger feedlots." *Id.*, para. 9.

Aggravating the absence of "plus factors" is the absence of a plausible motive for the scheme described by the Plaintiffs. *Matsushita* instructs that the less Plaintiffs' claim "makes economic sense," the more persuasive is the evidence required to support that claim. 106 S.Ct. at 1356. The evidence shows, and the Plaintiffs have not disagreed, that the price which the packers received for their product from the retailers was directly influenced by the Yellow Sheet. If the packers conspired to depress this price, therefore, they would depress their own income. Russell Walker characterized such a scheme as "suicidal." Walker affidavit, para. 10(a). Plaintiffs respond that the packers were motivated by a desire to stabilize the margin between live cattle costs and dressed beef prices. They suggest that the packers did not care about depressed income so long as their costs remained equally depressed. By depressing the price of live cattle, so the argument goes, the packers would save interest on

the capital required to purchase the cattle. Assuming that this scheme caused a 2–cent-per-pound differential, as concluded by Dr. Cothern, the packers would have engaged in this elaborate price-fixing scheme to save the interest on 2 cents a pound. That packers would risk treble damages to save the interest on 2 cents a pound is implausible. This motivation theory seems further strained in view of Plaintiffs' earlier argument that the packers tied up relatively small amounts of capital in cattle purchases. In their Resistance to the pending motions, Plaintiffs asserted the following:

> The recitation that packer margins are low does not take into consideration the turnover of cattle and beef in the slaughter operation. The major cost to the packer is the cost of cattle. At most, the packer will have a week's supply of cattle purchased, and resultingly will have the amount of capital tied up in cattle inventory needed to purchase that week's supply.... The same capital is used over again every week. Thus, in a year, that capital produces a return 52 times.

Resistance at 129.

While anything is possible, the Plaintiffs' motive theory makes little economic sense. Therefore, proof of the conspiracy must be especially strong to defeat summary judgment. The Court concludes that there is insufficient evidence tending to show the existence of a conspiracy under § 1 of the Sherman Act and that the Defendants are entitled to summary judgment.

*National Provisioner's Motion*

██ Even were the Court not to grant the packers' motion for summary judgment, it would grant the motion by National Provisioner. That Defendant is the independent publisher of the Yellow Sheet which, among other things, reports daily prices and price changes in the purchase and sale of meat of certain grades. It does not report live cattle prices. Its sole source of revenue is from advertising and public subscriptions. Its only relationship with IBP and Excel is that those Defendants subscribe to the Yellow Sheet.

Plaintiffs argue that National Provisioner was a knowing participant in an anti-competitive plan. As "evidence" to support this theory, Plaintiffs seize upon excerpts from a deposition exhibit of Lester Norton, describing conditions which caused the founding of the Yellow Sheet in 1923. Norton explained that 1923 was a year of "chaotic marketing conditions in the meat industry" and that markets were affected by rumor and conjecture in the absence of facts. The Yellow Sheet was created in an effort to provide the industry "accurate and unbiased market facts which had not been previously available." Resistance at 65–66. Plaintiffs assert that because the Yellow Sheet was subsequently used as a factor in pricing live cattle, that Norton would frequently meet with members of the packing industry, and that the Yellow Sheet reported packer-to-packer trades, the National Provisioner was a knowing member of an antitrust conspiracy. This proposition is frivolous. Plaintiffs conclude their argument against National Provisioner with citations to apparently unsworn congressional testimony by an ex-FBI agent, Nick Wultich. The testimony purports to be an analysis of certain raw data not in evidence, and there is no evidence as to how Wultich arrived at his conclusions nor what qualifications he had for doing so. Moreover, the Supplemental Affidavit of Lester Norton, dated September 8, 1987, casts serious doubt on Wultich's conclusions. The Court rejects Wultich's testimony as inadmissible evidence. *See, Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987). Plaintiffs also contend that National Provisioner's "primary source of revenue" is the packers, a proposition unsupported by the evidence. Even if an unlawful Section 1 conspiracy existed, the National Provisioner was not part of it.

### Attempted Monopoly

■ Apparently only IBP is charged with an attempt to monopolize. *See,* Plaintiffs' Resistance at 106.[2] To establish a claim of attempted monopoly, Plaintiffs

must prove (1) a specific intent to monopolize and (2) a dangerous probability that the attempt will succeed. *Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516, 525 (5th Cir.1982). Monopoly is the power to fix prices and exclude competition. *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 441 (5th Cir.1982). Subsumed in the above two elements is a third, namely predatory or anticompetitive conduct undertaken by the defendant in order to accomplish the unlawful purpose. *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir.1987); *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540 (7th Cir.1986). *See also United States v. American Airlines, Inc.*, 743 F.2d 1114, 1119 (5th Cir.1984); *Dimmitt Agri*, 679 F.2d at 532 n. 17. This latter element is necessary to prove a willful violation of law, as distinguished from business growth or development which results from a superior product, business acumen, or historic accident. *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1182 (5th Cir.1988); *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 990 (5th Cir.1983).

■ Attempting to demonstrate that IBP intended to monopolize the market and engaged in anticompetitive conduct, Dr. Bruce W. Marion cites testimony from Hughes Bagley, a former IBP vice-president, who appeared before a congressional committee in 1979. Among other things, Bagley stated that IBP management hoped to draw live cattle away from competitors by being "the most efficient slaughterer with the lowest cost." If this could be accomplished, "IBP would then be in a situation where it could go out and purchase live cattle at a higher price than any of its competitors." Marion Affidavit at 22. To the extent that this was the antitrust scheme, these Plaintiffs clearly cannot complain about it. Even assuming an antitrust violation, Plaintiffs must show that they were injured as a direct consequence of that violation. *Walker v. U–*

---

**2.** Even if the Court is mistaken that Plaintiffs are not charging Excel with attempt to monopolize, there is no evidence to support such a

claim against Excel and Plaintiffs make no serious effort to pursue it.

*Haul Co. of Miss.,* 747 F.2d 1011, 1014 (5th Cir.1984). Actions by Defendants that increased the price paid to Plaintiffs do not confer standing. *Matsushita,* 106 S.Ct. at 1354.

Other evidence relied upon by Dr. Marion include an excerpt from a memo of December 8, 1975, by Perry Haines of IBP. Read in its entirety, that memo furnishes clear evidence of vigorous competition, not an attempt to monopolize. The memo reflects that IBP became aware that its Cattle Pak sales had significantly decreased between 1974 and 1975, both in absolute numbers and in percentage of processed carcasses. A management committee concluded that the product was priced too high. Because of declining costs, the profit margin had increased but the product was no longer competitive. IBP determined to increase its volume rather than its profit margin in order to ultimately increase its total dollars of profit. There is no suggestion in the memo that IBP ever contemplated pricing the product below cost. On the contrary, the entire objective was to maximize sales and profits. Cutting prices to increase business "often is the very essence of competition," and courts must be cautious not to draw conclusions which would "chill the very conduct the antitrust laws are designed to protect." *Id.* at 1360.

Plaintiffs also refer to a Haines' memo of October 14, 1975, which discussed reasons why IBP should develop outside suppliers of carcasses. Plaintiffs seize upon one sentence in this 17–page memorandum as evidence of anticompetitive intent. A fair reading of the entire memo, however, could not reasonably furnish even a scintilla of evidence of such an intent. On the contrary, the memo presents a reasoned statement of why the proposal would enable IBP to improve its efficiency and control costs. Haines' mention of a strategy "to grow in market share" is not anticompetitive. "All lawful competition aims to defeat and drive out competitors. Therefore, the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize." *Great Escape, Inc.,* 791 F.2d at 541. The Supreme Court deemed it the "central message of the Sherman Act" that a business entity "must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors." *United States v. Citizens and Southern National Bank,* 422 U.S. 86, 95 S.Ct. 2099, 2116, 45 L.Ed.2d 41 (1975). IBP cannot be faulted for vigorously and efficiently competing.

The remaining facts relied upon by Dr. Marion similarly reflect pro-competitive conduct that would not support an inference of a specific intent to monopolize. For example, Dr. Marion stated that part of IBP's "strategy" was to be the lowest cost slaughterer of beef by operating plants at full capacity and maintaining lower wages; expanding slaughter capacity and cattle purchases in various regions; purchasing carcasses from other packers; and converting retailers to boxed beef. Marion Affidavit at 20–22. Plaintiffs conclude that their "most important" piece of evidence is that IBP "engaged in a successful price-fixing scheme over a number of years." Resistance at 123. As the Court has previously indicated, there is insufficient evidence of such a scheme.

▇▇▇ Not only have Plaintiffs failed to show a specific intent to monopolize, they also have not shown a dangerous probability that such an attempt would succeed. To establish a dangerous probability of success, plaintiffs must define the relevant geographic and product market. *Dimmitt Agri,* 679 F.2d at 525. This definition is a "prerequisite to success," *C. E. Services, Inc. v. Control Data Corp.,* 759 F.2d 1241, 1244 (5th Cir.1985), and a "threshold requirement". *In re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d at 441. Plaintiffs have not been precise in making this definition. In their "Concise Statement of Contentions," filed in 1985, Plaintiffs sought to represent a single class of persons residing in 23 states and who were in the business of raising "fat cattle." Dr. Marion asserts that there are two distinct relevant markets in this case, a regional procurement market for fed cattle and a national sales market for

boxed beef. Marion Affidavit at 4. He proposes fourteen geographic markets, Marion Exhibit 3, the boundaries of which he concedes are "somewhat subjective." Marion Affidavit at 6. His statistical data, however, is variously from those regions, states, groups of states, and the nation. This definition of the market is too vague to be useful.

Even if the market were adequately defined, the evidence of market power does not give rise to an inference that an attempt by IBP to monopolize would have a dangerous probability of success. Exhibit 13 to Dr. Marion's affidavit shows that the largest percentage share of fed cattle slaughtered by IBP from 1977 to 1985 was 28.6%. The Court recognizes that the Fifth Circuit has not fixed an absolute minimum market share necessary to establish an attempt offense. *See Dimmitt Agri*, 679 F.2d at 533. Unquestionably IBP is a major player in both the input and output market for fed cattle. However it is impossible to conclude from this record that IBP, standing alone, would probably acquire enough power to fix prices and exclude competition.

In that connection, the United States Supreme Court recently examined "both the market for fed cattle (the input market) and the market for fabricated beef (the output market)." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 487, 93 L.Ed.2d 427 (1986). It found that these markets "are highly competitive, and the profit margins of the major beef packers are low. The current markets are a product of two decades of intense competition...." *Id.* The Supreme Court noted "that the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Id.*, 107 S.Ct. at 492. The Supreme Court also noted that, after a proposed merger with Monfort, Excel's share of the cattle slaughter and production markets would be 20.4%. IBP was found to have 24.4% of the slaughter market and 27.3% of the production market. *Id.* at 487 n. 2. The Supreme Court expressed skepticism

that even Excel's increased market share would give it sufficient market power to engage in successful predatory pricing. *Id.* at 494 n. 15. It is similarly unlikely that IBP's slightly higher market share would allow it to engage in predatory pricing. As the Supreme Court explained in *Matsushita*, a predatory pricing scheme is inherently speculative and uncertain. 106 S.Ct. at 1357. There is no credible evidence of such a scheme in this case.

Dr. Marion's supplemental affidavit furnishing data on "the top four packers" is not particularly relevant to the question of IBP's probable ability to monopolize. If anything, the existence of three other strong packers further negates the probability that IBP, standing alone, could acquire the power to fix prices and exclude competition.

Because feeders have not produced sufficient competent evidence to show the elements of an attempt by IBP to monopolize, Defendants motion for summary judgment on this claim is granted.

### *Conspiracy to Monopolize*

■ Both IBP and Excel are charged with conspiring to monopolize. To establish this claim, Plaintiffs must prove 1) the existence of a combination or conspiracy between IBP and Excel, 2) overt acts done in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize. *J. T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 796 (5th Cir.1983).

■ While Plaintiffs assert that senior officials of IBP and Excel conversed frequently and met at least once to discuss future market prices, the Court can find no evidence of any conspiracy to monopolize on the part of these two Defendants. As discussed above, Plaintiffs' evidence of a specific intent to monopolize of IBP is sparse. Evidence of such an intent on the part of Excel is nonexistent. In their brief on this point, Plaintiffs primarily recite a history of mergers and attempted mergers leading to the present corporate structure

of Excel. They then conclude that Excel can now "command a market share almost equal to that of IBP." Resistance at 128. Be that as it may, it is no evidence of a conspiracy to monopolize. Under *Matsushita*, conduct which is as consistent with legitimate business behavior as with a conspiracy to violate the antitrust laws is insufficient to defeat summary judgment. Therefore, Defendants' motion for summary judgment on this claim is GRANTED.

### *Summary*

Defendants' motions for summary judgment are GRANTED. Lead counsel for Defendants shall forthwith draft a proposed judgment, submit same for approval as to form by Plaintiffs' liaison counsel, and file it with the Court on or before January 27, 1989.

### ON MOTION FOR RECONSIDERATION

Presently pending is Plaintiffs' motion for reconsideration of this Court's Memorandum Opinion of December 28, 1988, filed January 4, 1989. In considering this motion, this Court is mindful of the fact that the "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harasco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3rd Cir.1985) (citing *Keene Corp. v. Int'l Fidelity Insurance Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1983)).

Plaintiffs' new affidavits do not show the existence of any newly discovered evidence. The affidavits purportedly clarify the arguments and positions already presented to this Court. Some affidavits seek to put a new spin on evidence already presented in the summary judgment proceedings. Since these affidavits "could have been adduced during pendency of the summary judgment motion," *Keene Corp.*, 561 F.Supp. at 665 (citations omitted), Plaintiffs' affidavits and accompanying exhibits have not been considered.

This Court has considered the parties' arguments regarding the soundness of its Opinion and is not convinced that there are any manifest errors of law. However, there is an error of fact which should be corrected. The Yellow Sheet was characterized as a "statistical report on past average price." Memorandum Op. at 5, lines 12, 13, 14, 15. Beginning with "Also", those lines are now corrected and should read:

> "Also, the Yellow Sheet reports a closing price without identifying parties to particular transactions. The information is public.. *See, Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522, 526 (9th Cir.1987)."

The foregoing fact is undisputed and does not change the analysis. Therefore, a hearing on this point is unnecessary. Having considered Plaintiffs' motion for reconsideration, and finding no other manifest errors, the motion is DENIED.