In re BEEF INDUSTRY ANTITRUST LITIGATION MDL DOCKET NO. 248.

MEAT PRICE INVESTIGATORS ASSOCIATION, an Iowa unincorporated association and trust, et al., Plaintiffs–Appellants,

v.

IOWA BEEF PROCESSORS, INC. (now known as IBP, Inc.), a Delaware Corporation, et al., Defendants–Appellees.

No. 89–1483.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1990.

---

Scott A. Hawkins, Hawkins & Hawkins, Dallas, Tex., Lex Hawkins, Glenn L. Norris, Thomas A. Palmer and Carla T. Schemmel, Des Moines, Iowa, John A. Cochrane, Stewart C. Loper, Cochrane & Bresnahan, St. Paul, Minn., Donald J. Polden, Des Moines, Iowa, for plaintiffs-appellants.

James W. Witherspoon, Witherspoon, Aikin & Langley, Hereford, Tex., for Cameron, et al.

Morris Harrell, Marshall M. Searcy, Jr., Locke, Purnell, Rain & Harrell, Dallas, Tex., for Iowa Beef & Excel Corp.

William G. Schopf, Jr., Patrick J. Heneghan, Jonathan A. Backman, Schopf & Weiss, Chicago, Ill., for IBP, Inc.

John C. Dods, James T. Newsom, Shook, Hardy & Bacon, Kansas City, Mo., for Excel, Inc.

George T. Frampton, Univ. of Ill. Law School, Champaign, Ill., for Nat. Provisioner, Inc.

Before CLARK, Chief Judge, and GARWOOD, and SMITH, Circuit Judges.

CLARK, Chief Judge:

## I. Introduction

Meat Price Investigators Association and several individual cattlemen (collectively "the cattlemen") appeal the district court's grant of summary judgment in favor of IBP, Inc. (formerly Iowa Beef Processors, Inc.), and Excel Corporation (collectively "the packers"), and the National Provisioner, Inc. (the "Yellow Sheet"). On appeal, the cattlemen assert that material questions of fact remain unresolved regarding their claims under §§ 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1 and 2. We affirm.

## II. Facts

Because the history of this case has been published in part four times, *see In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980) (*BIAL I*); *In re Beef Industry Antitrust Litigation*, 542 F.Supp. 1122 (N.D.Tex. 1982) (Higginbotham, J.), *aff'd*, 710 F.2d 216 (5th Cir.1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984) (*BIAL II*); *In re Beef Industry Antitrust Litigation*, 713 F.Supp. 971 (N.D.Tex.1989) (Kazen, J.), a summary of the facts is sufficient here. In 1977 this suit was filed by various sellers of "fed cattle" against major beef packers, beef retailers, and the publisher of a commodities price reporting service. Fed cattle are steers and heifers which are raised and prepared specially for human consumption, usually as "U.S.D.A. choice or good" beef. The cattlemen sell most of their fed cattle to packers. Most packers slaughter and fabricate the beef, while some packers buy preslaughtered beef for fabrication. The packers then sell the beef, either as entire carcasses or as "boxed beef", collections of various beef cuts, to retail marketers such as grocery

stores and hotel chains. The suit alleges that the retailers and packers conspired in a vertical and horizontal restraint of trade which stabilized and depressed fed cattle prices.

The cattlemen allege that this restraint took the form of the following price-fixing scheme: The National Provisioner publishes a daily price for beef products and other commodities in its publication, the Yellow Sheet. The Yellow Sheet bases the price it publishes upon reports of recent commodity sales, although the published price is not strictly an average of all reported sales. The packers use the Yellow Sheet price to determine the price they offer the cattlemen for fed cattle. At the same time, retailers use the Yellow Sheet price to compute the price they will pay packers for fabricated beef. By common use of the Yellow Sheet price, packers are able to stabilize and depress the price of live beef while retaining a healthy profit margin because they know the retailers also use the Yellow Sheet price as a price base. In this way the depressed beef prices are actually "passed on" from the retailers to the packers to the cattlemen in a reversal of the more common situation where price increases are passed on from wholesalers to retailers to consumers. The cattlemen relied on this pass-on theory for standing to sue the retailers, with whom they had no direct business dealings. The district court, Higginbotham, J., rejected this theory, *citing Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1976), and entered summary judgment for the retailers. *See* 542 F.Supp. 1122. We affirmed in *BIAL II*, 710 F.2d 216.

This appeal involves the packer phase of the identical price-fixing allegation. The cattlemen allege that the packers violated § 1 of the Sherman Act by using an information exchange (the Yellow Sheet) and consciously parallel pricing to depress live cattle prices. They also allege that IBP violated § 2 of the Sherman Act by attempting to monopolize both the market for live cattle and the market for processed beef and that IBP and Excel conspired to monopolize the fed cattle market.

## III. The § 1 Claim

### A. The Contentions

■ Central to the cattlemen's § 1 claim is the allegation that IBP and Excel used the daily Yellow Sheet reported price as the basis for their live cattle purchasing price. The existence of the Yellow Sheet, the cattlemen contend, allows the packers to eliminate competition between themselves in buying cattle. They assert that the information exchange is illegal under *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), and that by use of the Yellow Sheet IBP and Excel, which hold significant market shares in the cattle procurement market, are able to depress live cattle prices through tacit collusion.

The packers respond that, as the district court found, Container Corp. does not apply here because the information given to the Yellow Sheet was public information which could be purchased by subscription and used by cattlemen, packers, and retailers alike. They also contend that the cattlemen have offered no evidence of parallel pricing on the part of IBP and Excel which cannot be explained as independent business activity. Because the cattlemen adduced no evidence that "'tend[ed] to exclude the possibility' that the alleged conspirators acted independently," *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *quoting Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984), the packers and the National Provisioner assert that the district court properly entered summary judgment on their behalf.

### B. The Law of the Case

■ We have stated: "a decision of a factual or legal issue by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a

later appeal in the appellate court." *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, 1005 (5th Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983), *quoting White v. Murtha,* 377 F.2d 428 (5th Cir.1967); *see Lyons v. Fisher,* 888 F.2d 1071, 1074 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2209, 109 L.Ed.2d 535 (1990). In *BIAL II,* the appeal of the summary judgment entered on behalf of the retailers in this litigation, the use of the Yellow Sheet price by the packers was a key issue. In determining that the Yellow Sheet was only one of several factors influencing the packers' pricing activity, we stated:

> The defendant's overwhelming proof demonstrates that other factors beyond the Yellow Sheet quotations influenced the packers' pricing decision. Specifically, the proof showed that the following factors influenced packers' pricing decisions:
>
> (1) The packers' individual needs in regard to obtaining a minimum amount of cattle each week. This was necessitated by labor contracts which required that if the packers opened their doors on Monday, they had to pay their employees for the week, regardless of whether they worked.
>
> (2) Temporary local market conditions such as the weather or an over or undersupply of beef. This forced the packers to bid over or under the Yellow Sheet price.
>
> (3) Price competition among the packers.
>
> (4) The beef by-product market (i.e. the sale of hides and nonedible parts of cattle). This market was highly competitive and forced the packers to pay prices over and under the Yellow Sheet Price.

710 F.2d at 219–20. The extent of the packers' reliance on the Yellow Sheet in pricing was critical to the claim that the retailers were part of a pass-along price-fixing scheme in which the corresponding packer violations were pivotal. Likewise, proof that the Yellow Sheet has been used by the packers as a price-fixing mechanism is essential to the § 1 claim before us now.

This is true whether the cattlemen rely on a theory of illegal information exchange or conscious parallelism in pricing, for the elements of the scheme presented in *BIAL II* are merely the vertical correspondents of the horizontal price-fixing scheme alleged here. See 713 F.Supp. at 974. We are bound by the finding of the *BIAL II* panel that the Yellow Sheet was only one of a number of constantly varying factors used by the packers to establish their daily price for fed cattle. Standing alone, the information provided by the Yellow Sheet is not the type of determinative pricing information which enables price-fixing. *Cf. United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (The prices exchanged were current actual prices offered to specific customers.); *Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (The prices exchanged were the latest actual prices offered.); *Maple Flooring Mfrs. Assn. v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1924) (The prices exchanged were the average costs of goods categorized by size.) Thus, to warrant a reasonable inference of tacit collusion or conscious parallelism from circumstantial evidence alone, *see Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57, it became necessary not only for the cattlemen to produce evidence that the pricing activity of the packers was consciously parallel, but also that the other pricing factors established by the *BIAL II* panel were considered in and controlled by the packers' tacit collusion. The cattlemen fail on both points.

The cattlemen presented insufficient evidence to have persuaded a reasonable jury that the common use of the Yellow Sheet caused the prices paid by IBP and Excel for fed cattle to be substantially identical. The cattlemen point us to no comparison of pricing activity which demonstrates a three-way correlation between the prices quoted by the Yellow Sheet, those paid to cattlemen by IBP, and those paid to cattlemen by Excel. Instead, they attempt to show that both packers used the Yellow Sheet price when selling beef to each other,

for individual corporate bookkeeping purposes when making intracorporate transfers of beef from a packer's slaughtering division to its fabrication division, and for assessing the job performance of its cattle buyers. These pricing activities do not reflect the prices actually paid to cattlemen.

The cattlemen do cite a report by Dr. Richard Hoyt, an economic consultant, which states that the prices paid by IBP for fed cattle and the prices reported by the Yellow Sheet for choice, yield-three steers, six to seven hundred pounds, showed a 97% correlation between 1975 and 1978. This report is inconsequential for two reasons. First, the report merely shows that when IBP raised or lowered its live cattle prices, the Yellow Sheet correspondingly reported a higher or lower market price for processed beef. Only if the Yellow Sheet was incorrect in its reporting or IBP was asking a price for processed beef which was inconsistent with the market as a whole would any different situation arise. Such pricing activity is not evidence of price fixing. Rather, it shows that the pricing activity of a major packer such as IBP affected the market as one would expect. Second, the figures compared by Hoyt were weekly carcass costs for IBP and weekly averages of the Yellow Sheet prices, not individual sales records of IBP or daily Yellow Sheet prices. Such gross price averaging is not significant in a market where, as the cattlemen assert, a two cent per pound difference in price can make a large difference in profits and losses to both cattlemen and packers. Hoyt's method of comparison could show a strict price correlation even for weeks in which the IBP processed beef price and the Yellow Sheet price differed markedly on given days. The report, therefore, constitutes no evidence of a correlation between the Yellow Sheet quotes and IBP prices for individual transactions. The statistics in the report do not purport to consider any contemporaneous pricing activity of Excel.

The cattlemen's evidence was also insufficient to have persuaded a reasonable trier of fact that the packers' responses to additional pricing factors were ever collusive. The cattlemen present no appellate argument regarding the effects on the packers' daily pricing activity of the competitive by-product market, labor contracts, or local market conditions such as weather and accessibility.

### C. Conclusion

■ When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel. *See, e.g., Park v. El Paso Bd. of Realtors,* 764 F.2d 1053, 1060 (5th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). The cattlemen have not done this. Nor have they shown that the prices of IBP and Excel were identical, or nearly so, for any series of individual transactions. The failure of the cattlemen to account for the additional pricing factors in their theory of conscious parallelism is also fatal. The existence of other significant pricing factors, concerning which there is not even the contention of collusion, shows that the pricing activity of the packers was "as consistent with permissible competition as with illegal conspiracy." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356. Our prior decision that these factors influenced packer pricing and the cattlemen's failure to produce any different substantial evidence on these factors during the present summary judgment proceedings, *see Lyons,* 888 F.2d at 1074, confirm the correctness of the district court's summary judgment order in favor of all defendants as to the § 1 claim.

### IV. The § 2 Claim

The cattlemen claim that IBP has illegally acquired monopoly power in the boxed beef sales market and monopsony power in the fed cattle procurement market.[1] Antithetically, the cattlemen also claim that

---

1. "Monopoly is the term used to describe the situation where there is only one seller of a product, monopsony where there is only one buyer." R. POSNER & F. EASTERBROOK, AN-TITRUST: CASES, ECONOMIC NOTES AND OTHER MATERIALS 148 (2d ed. 1981) (afterwards "Posner & Easterbrook").

IBP and Excel have misused their power as oligopsonists [2] in a conspiracy to control the procurement market. The contradictions of theory and proof between these claims and the lack of evidence supporting the cattlemen's allegations make all of their § 2 allegations untenable.

First, the cattlemen fail to recognize that IBP cannot be a monopsonist and an oligopsonist at the same time. Either IBP is the only significant buyer of fed cattle or it is not. More importantly, the cattlemen fail to account for the fact that the reactions of a monopsonist to market forces are likely to be very different from the reactions of an oligopsonist in a similar situation. Whereas a monopsonist "has an incentive to limit his purchases in order to reduce his input costs and thereby increase his profits," Posner & Easterbrook at 148, an oligopsonist that is attempting to increase its position in the market would, like an oligopolist in a seller's market,[3] initiate a competitive, or perhaps predatory, campaign of price and/or non-price competition. Alternatively, an oligopsonist that is satisfied with its market share could form an alliance with other oligopsonists in the relevant market and attempt to depress prices and increase profits. *See* R. Posner, *Antitrust Law: An Economic Perspective* 39–53 (1976) (afterwards *"Economic Perspective"*). *See generally Interstate Circuit v. United States*, 306 U.S. 208, 223, 59 S.Ct. 467, 472–73, 83 L.Ed. 610 (1939) (emphasizing a parallel change in the business procedure of competitors as evidence of collusion); Page, *The Chicago School and the Evolution of Antitrust: Characterization, Antitrust Injury, and Evidentiary Sufficiency,* 75 Va.L.Rev. 1221 (1989); Sullivan, *The Viability of the Current Law on Horizontal Restraints,* 75 Calif.L. Rev. 835 (1987).

■ Under these alternative possibilities, in order to demonstrate that IBP had obtained monopsony power or had become an oligopsonist conspiring with Excel to depress prices, the cattlemen would have had to show that IBP reduced its purchases of and its prices for fed cattle in order to take illegal advantage of this position. See H. Hovenkamp, *Economics and Federal Antitrust Law* 17–18 (1985); Posner & Easterbrook at 148–150. This approach would be consistent with the tack taken by the cattlemen in their § 1 claim. On the other hand, to demonstrate that IBP was a predatory oligopsonist seeking to increase its market share through an illegal form of competition, the cattlemen would be required to show predatory or exclusionary conduct on the part of IBP.

The cattlemen do contend that IBP attempted to drive its competitors out of the fed cattle procurement market by paying a higher price for fed cattle than the market suggested. The cattlemen cite statements by Bagley, a former assistant head cattle buyer of IBP, to the effect that IBP at one time planned to cut processing costs so that it could pay higher prices for live cattle. According to Bagley, this predatory pricing would result in IBP's domination of the cattle procurement market. The case against IBP as a predatory oligopsonist is completely undercut, however, by the cattlemen's own evidence, cited on numerous occasions, that fed cattle prices over the past ten years have remained stable at a depressed level. The cattlemen presented no evidence that IBP ever paid a predatory price (in this case, a price higher than that which would allow the packer to make a profit) for fed cattle. Thus, the cattlemen's allegations of predatory activity by IBP in the cattle procurement market was not supported.

---

**2.** An oligopsony is "a market situation in which each of a limited number of buyers is strong enough to influence the market but not strong enough to ignore the reaction to such influence by his competitors." An oligopsonist is one of such dominant buyers. WEBSTER'S THIRD INTERNATIONAL DICTIONARY (UNABRIDGED) 1572 (1966).

**3.** An oligopoly is "a market situation in which each of a limited number of producers is strong enough to influence the market but not strong enough to disregard the reaction of his competitors." An oligopolist is one of such dominant producers. WEBSTER'S THIRD INTERNATIONAL DICTIONARY (UNABRIDGED) 1572 (1966).

■ The evidence that live cattle prices have remained stable at a low level does fit the cattlemen's alternative allegations that IBP either has monopsony power or is a conspiring oligopsonist seeking to depress prices and retain its current market share. But other factors make these allegations untenable. If IBP had monopsony power, it would take illegal advantage of that situation by reducing its purchases of fed cattle in order to reduce its costs and make a higher profit on each head of cattle processed. See Hovenkamp at 17–18; Posner & Easterbrook at 148–49. This would especially be true if, as the cattlemen assert, IBP also held an oligopolist's position as a seller of processed beef. IBP would then have been able to compound its monopoly profits by reducing its purchases of fed cattle, and thus its procurement costs, while also reducing its output in the processed beef market. The lowered output would again decrease IBP's marginal cost and permit an increase in the price IBP could charge for its processed beef. The amount of any additional price IBP could charge would depend on the market share it commanded. See Hovenkamp § 4.2; Posner, *Economic Perspective* 39–77. The difficulty in proving this theory is that the cattlemen produced no evidence that IBP actually has monopsony power. Indeed, their expert, Marion, stated that the cattle procurement market is shared by four major packers. Nor have the cattlemen shown that IBP ever significantly reduced its purchases of fed cattle or its output of processed beef.

■ The possibility remains that IBP and Excel acted as conspiring oligopolists to stabilize and depress prices in the cattle procurement market. The cattlemen rely on their § 1 evidence of pricing collusion and information exchange to establish a conspiracy between IBP and Excel to monopolize (or oligopsonize) the procurement market. In our discussion of the § 1 claim, however, we noted that the cattlemen's evidence of pricing collusion between IBP and Excel does not carry the summary judgment burden placed on an antitrust plaintiff by *Matsushita*. Additionally, viewing the fed cattle procurement market as a whole, this allegation is economically unfeasible in light of Marion's statement that as of 1982 the market contained four major packers and 471 smaller packers. Any attempt at conspiracy between only two of those packers to depress fed cattle prices could not succeed, because the other packers, especially the other two major competitors, could raise their own fed cattle prices a small amount, effectively buy away the fed cattle that had previously been the source of sales to IBP and Excel, and leave IBP and Excel with a smaller market share. This would actually spur competition by forcing IBP and Excel to respond by raising their own prices for fed cattle. This occurrence would fit the standard model of cartelization and cartel cheating which apparently destroyed many cartels even before the antitrust laws were enforced. See Posner, *Economic Perspective* at 52–55; Page at 1248–49.

The cattlemen's § 2 claims against IBP and Excel are inconsistent and unsupported by any summary judgment evidence. Much of the evidence produced by the cattlemen to support the theory of one claim defeats their alternative claim. Based on the entire summary judgment record, the conduct of IBP and Excel is at least "as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. The district court's grant of summary judgment as to the § 2 claim was proper.

## V. Conclusion

Because we affirm the district court's summary judgment order, we do not reach the cattlemen's appeal of the denial of class certification.

The judgment of the district court is

AFFIRMED.